NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CERTIFIED GROCERS OF ILLINOIS, INC., Respondent.

No. 85–2918.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1986.

Decided Nov. 21, 1986.

---

---

ments about confidentiality added up to the announcement of an overbroad rule that interfered with the workers' statutory right to engage in concerted activities by exchanging nonconfidential information. Later a representation election was held which the union lost by a large margin. The Board's regional director has ordered a new election; his order is at present on appeal to the Board.

The Board's practice, upheld in *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), is to require the employer to disclose to the union, once a representation election is either ordered or agreed to, the names and addresses of the employees eligible to vote. But the incidents giving rise to the unfair labor practice charge in this case occurred before the election was ordered, and neither party has suggested that the Board's requirement of disclosure after the election is ordered is material to our consideration. Cf. *Southern & Western Lumber Co.*, 212 N.L.R.B. 668, 669 n. 2 (1974).

The administrative law judge held that Alessi's statements "would have reasonably led the employees to believe that *any* disclosure of names, addresses, and/or wage rates, regardless of how they became aware of the information, could lead to discipline." (Emphasis in original.) Thus, even if the employee had not obtained the information from a confidential source—even if the information consisted of the employee's own name, address, or wages—the employee might (the administrative law judge thought) reasonably believe himself forbidden to disclose the information to anyone. Although the administrative law judge rejected the argument that Alessi's purpose in formulating and announcing such an overbroad "rule" was to interfere with the union's organizing campaign, she concluded that this was the likely consequence; and since the exchange of nonconfidential information ancillary to protected concerted activities is itself protected by section 7 of the Act, the rule, regardless of its purpose, was, she thought, an interference with rights protected by section 7, and therefore violated section 8. The Board

upheld the administrative law judge's decision without opinion.

The parties agree that a rule which merely forbids employees with access to confidential information to disclose it without the company's authorization is valid even though an incidental effect may be to make it harder for the union to organize the company's workers. See, e.g., *Texas Instruments, Inc. v. NLRB*, 637 F.2d 822, 827–32 (1st Cir.1981); *NLRB v. Florida Steel Corp.*, 544 F.2d 896, 897 (5th Cir.1977); *International Business Machines Corp.*, 265 N.L.R.B. 638 (1982). The parties also agree that the company cannot go further and forbid the disclosure of nonconfidential information as well, to the detriment of the union's organizing efforts. See, e.g., *Bullock's*, 247 N.L.R.B. 257, 258 (1980). If Certified had announced that an employee cannot disclose his own name, address, or wages, or the name, address, or wages of any other employee however the information about the other employee was obtained—so that if Beukema had told the two employees who were conducting the union's organizing campaign, "My name is Beukema, and I live at such-and-such address," she would have violated the rule— section 8 would have been violated. See, e.g., *W.R. Grace Co.* 240 N.L.R.B. 813, 815–16 (1979). Such a rule would impede the union's organizing efforts while serving no lawful interest of either the company or its employees. The issue is whether the "rule" supposedly announced, piecemeal, by Alessi could reasonably be understood to reach so far.

 We find incomprehensible the characterization of Alessi's answer to Beukema's question (an answer repeated at the three other meetings), and to the questions put by Certified's lawyer in the representation hearing, as the announcement of a rule forbidding the disclosure of nonconfidential information. This is not because a company rule or policy, to run afoul of section 8, need always be in writing; plainly it need not be. It is because context and common sense make clear that Alessi's oral

responses could not have been understood to be laying down a company policy against workers' disclosing information obtained without any breach of confidence, such as their own names. Beukema was not complaining to Alessi that the union was using information it had obtained *from her*; she was complaining because she believed that only the company had her new address and that it should not have given it to the union. When against this background Alessi told the workers at the four meetings that the names and addresses of employees were indeed confidential, that the leak of which Beukema had complained could only have come from one of three departments in the company, and that whoever was responsible for the leak would (if caught) be disciplined, he could only have meant—and more important could only have been understood to mean—that it was against company policy for workers to disclose confidential information to which they had access by virtue of their employment in the payroll, personnel, or data-processing departments. To understand Alessi to have meant that one worker could not tell another worker his or her name would be fantastic. It is hardly surprising that no one testified to any such understanding.

█ The implicit premise of the Board's decision—that an answer to a question is a rule, and had better therefore dispel every possible ambiguity and incorporate every necessary qualification, lest it be considered overbroad—would make it difficult, maybe impossible, for company officials to answer questions during organizing campaigns. Every time they uttered anything about company policy, even just a one-word answer to a question from the floor, they would be deemed to have promulgated a rule, and their utterance would be scrutinized for explicit qualifications necessary to save the rule from a charge of being too broad, even if the possibility of anyone's being misled was as remote as it was here. The qualification is important. If the scope of a rule is not obvious, a loose oral statement may convey to some listeners an exaggerated impression of its scope, as in *Lucky Stores, Inc.*, 271 N.L.R.B. 1190,

1197 (1984). But no reasonable person (and the standard used by the Board is one of reasonableness—the Board is not seeking to protect the least alert or intelligent worker) thinks that when a company inveighs against leaks of confidential information it is telling him to conceal his name.

The Board's analysis is especially unsatisfactory with regard to Alessi's testimony, for here the "rule" was inferred only by tacking the lawyer's questions to Alessi's essentially one-word answers. The lawyer asked, in a hearing at which two employees were present (the union's organizers), "Mr. Alessi, it is company policy that information with respect to pay rates is confidential?" Alessi answered "Yes." He also answered, "That is correct," to the lawyer's question, "Is my statement [correct] that an individual who reveals to an outside person the pay rates of the company, is subject to disciplinary action?" By these two exchanges a rule is deemed to have been created which forbids any worker to tell another worker, not what the company's pay rates are, but what his own pay is. The Board would require Alessi, before answering, to have rephrased the lawyer's question so that the combination of question and answer would have had the precision and completeness of a published rule. We don't understand how a legal proceeding could be conducted if such a threat of liability hung over, not a lie or a misstatement, but a failure to phrase every answer as a general law. We add that the Board's theory makes Certified's lawyer complicit in the alleged violation of section 8—an imputation for which the record provides no support.

We might still our doubts about the reasonableness of the inferences drawn by the Board—for we know that our role as a reviewing court is a distinctly limited one—if the Board, which is to say the administrative law judge, had some basis in reason or precedent for taking the unusual view that it did. But all the administrative law judge said to the point (and the Board, as we have said, added nothing to her opinion) was that the company's

threats to discipline employees who disclosed names and addresses or wage rates included no qualification to indicate to employees that they were prohibited only from giving out information from company files, as opposed to information they had of their own knowledge. Indeed, the blanket nature of the threats [to discipline whoever disclosed confidential information], and the fact that Alessi's threats at the employee meetings as to disclosure of names and addresses were made to all the clerical employees, including those who would not have access in the normal course of their work to the information, would have reasonably led the employees to believe that *any* disclosure of names, addresses, and/or wage rates, regardless of how they became aware of the information, could lead to discipline. The cases cited above establish that such a pronouncement is unlawfully overly board.... [Emphasis in original.]

The "cases cited above," four in number, provide no support for this interpretation of Certified's "rule." Taking them in chronological order, *Ridgely Mfg. Co.*, 207 N.L.R.B. 193 (1973), enforced, 510 F.2d 185 (D.C.Cir.1975), held that the company had invoked a supposed company rule as a pretext for firing a worker because of his efforts on behalf of the union. *International Business Machines Corp., supra,* upheld a company's confidentiality rule against a challenge that it was overbroad. *Brigadier Industries Corp.*, 271 N.L.R.B. 656 (1984), aff'd, 776 F.2d 365 (D.C.Cir. 1985), upheld a company's rule against solicitations during worktime. *Roadway Express, Inc.*, 271 N.L.R.B. 1238 (1984), held that a company could discipline a worker for taking the company's records for union purposes, even though the company had not announced a rule against such misconduct. Only in *Ridgely* and *Roadway* had the rules not been reduced to writing. But in *Ridgely* the rule was a phoney, used just to give the company an excuse for firing union activists. And in *Roadway* the rule was self-evident (as arguably it was in the present case too); it was understood that

confidential information is confidential (just as it was understood here that confidential information is confidential and nonconfidential information is nonconfidential); there was no need to announce the "rule" orally, let alone write it down. In none of the cases was it suggested that an oral statement of policy, made in good faith, might violate section 8 because theoretically susceptible of being misinterpreted to forbid protected along with unprotected activity. The suggestion that Alessi's "threats" would be misunderstood because the audience included people who did not have access to confidential information overlooks the fact that what in one sense were "threats" were in another sense assurances to employees like Beukema, employees doubtless found in the audiences of all four meetings, that the company would protect the confidentiality of the information it had about them. This did not mean that the company would forbid them to tell anyone their own names.

What the Board has done here, perhaps by oversight (as suggested by its failure to write an opinion), is to take a perfectly good Board-made rule—the rule against company policies that while adopted in a good-faith effort to advance the company's lawful interests go too far and forbid conduct protected by section 7—and apply it in a fantastic fashion, never before contemplated. We are sure the Board does not want to paralyze the efforts of company officials to respond orally to questions about company policy raised by employees or in administrative hearings. But that would be the effect of our agreeing that an "overbroad" answer is an "overbroad" rule even when nobody who heard the answer in the context of the discussion or inquiry in which it was given would think it intended to control completely different questions. If you ask, does the company keep my medical records confidential, and the answer is "yes," you could not, as a reasonable person (the administrative law judge purported, as we have said, to be ruling on the basis of a *reasonable* understanding of Alessi's statements), infer that *you* are for-

bidden to disclose medical facts about yourself.

The usual purpose of confidentiality is not to maintain secrecy but to vest control over disclosure in one or a few persons—in the present case in the company, in the persons to whom the information pertains, and in those to whom these authorized disclosers voluntarily disclose it. Privacy is control, not secrecy, see, e.g., Stone, *The Scope of the Fourth Amendment: Privacy and the Police Use of Spies, Secret Agents and Informers*, 1976 Am.Bar Found.Research J. 1193, 1205–11, and the purpose of the company policy to which Alessi alluded, a policy the Board found had *not* been concocted to stave off unionization, was plainly to protect the privacy of its employees.

 Although the substantial-evidence rule that governs our review of administrative action covers inferences, as well as elementary facts of the who-did-what-to-whom variety (or, in this case, who-said-what-to-whom), and thus gives the Board broad latitude to infer the probable reaction of employees to ambiguous language directed toward them, the Board does not have *carte blanche* to impute irrationality to workers, whether directly or by describing as "reasonable" an irrational interpretation. A worker would have to be irrational to think that when Alessi answered perfectly natural questions concerning the confidentiality of employee records he was laying down a "rule" forbidding employees to disclose their names, addresses, and wage rates. Nothing in the context of his statements suggested any such ambition on his part or understanding on theirs, nor is there any evidence of such an understanding.

The present case is unlike such cases as *Jeanette Corp. v. NLRB*, 532 F.2d 916, 919 (3d Cir.1976), where a worker was fired for violating "an amorphous, unwritten policy [prohibiting employees from discussing their wages with one another] apparently framed only in the minds of the company officials." See also *Bell Federal Savings & Loan Ass'n*, 214 N.L.R.B. 75, 77–78

(1974). For a company to have secret rules, which it trundles out as pretexts for firing union "troublemakers," is a form of misconduct unrelated to the issue whether a reasonable and publicly announced policy is invalid because it might unreasonably be misunderstood to go further than necessary. Compare *Southern & Western Lumber Co., supra*, 212 N.L.R.B. at 669; *Ridgely Mfg. Co., supra*, 207 N.L.R.B. at 196. In no previous case has the Board found, or a court upheld, a finding of an unfair labor practice in such a situation.

Enforcement of the Board's order is DE-NIED.