Joseph A. SZABO, Regional Director of
the National Labor Relations Board,
Petitioner-Appellee,

v.

U.S. MARINE CORPORATION,
Respondent-Appellant.

No. 86–2003.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1986.

Decided May 4, 1987.

Joseph F. Frankl, argued, with whom Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Harold J. Datz, Assoc. Gen. Counsel, Joseph E. Mayer, Asst. Gen. Counsel, John W. Hornbeck, Deputy Asst. Gen. Counsel, Washington, D.C., on the brief, for petitioner-appellee.

Before POSNER, COFFEY and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

In 1984 U.S. Marine Corporation bought an engine plant in Wisconsin from Chrysler. The production and maintenance workers at the plant had been represented by a local of the Allied Industrial Workers. Pursuant to the terms of the sale Chrysler terminated these workers. U.S. Marine promptly rehired most of them. Contending that in these circumstances U.S. Marine was Chrysler's successor and was therefore obliged to bargain with the union, see, e.g., *NLRB v. World Evangelism, Inc.*, 656 F.2d 1349, 1354–55 (9th Cir.1981), yet refused to do so, the Board in 1984 brought suit against U.S. Marine in a federal district court in Wisconsin under section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j). This statute authorizes the district court to grant an injunction that will preserve the status quo until the completion of unfair labor practice proceedings before the Board; the Board had instituted such proceedings against U.S. Marine. In May 1984 the district court granted the injunction, from which U.S. Marine did not appeal, enjoining U.S. Marine from "refusing to bargain collectively in good faith concerning wages, hours and other terms and conditions of employment with [the union] as exclusive bargaining representative of its employees."

In 1986 the Board's regional director sought and obtained from the district court a finding that U.S. Marine was in civil contempt of the injunction, and, by way of remedy, an order directing the company (1) to mail a notice of the finding to each employee, (2) to file a statement of compliance, (3) to permit discovery concerning compliance matters, (4) to cease holding "Safety & Progress Committee meetings" (U.S. Marine may meet with its employees to provide them with information but "it

Fred G. Groiss, Quarles & Brady, Milwaukee, Wis., for respondent-appellant.

may not solicit questions or grievances from employees, nor may it make remarks reflecting an anti-union animus"), and (5) to pay the Labor Board the attorney's fees and other expenses reasonably incurred by the Board in the contempt proceeding, in an amount to be determined by the parties or, failing that, by the court.

■■■ U.S. Marine has appealed from the contempt order. When we denied a stay of the order pending appeal, U.S. Marine complied with its five paragraphs. Ordinarily compliance with an order of civil contempt makes the order moot, *Marshall v. Whittaker Corp.*, 610 F.2d 1141, 1145 (3d Cir.1979), because reversing the order would not benefit the party held in contempt. But this case is different. First, the order imposes a continuing obligation; if we reverse it, U.S. Marine will resume meetings of the Safety & Progress Committee. Second, the one-time obligations that the order imposes can be undone. If we reverse, U.S. Marine will, through a new mailing, retract its notification to the employees that it has been adjudged in contempt. It will also seek to recover the attorney's fees and other expenses that it has paid the Board in compliance with paragraph (5).

After the contempt order was issued, an administrative law judge found that U.S. Marine had indeed committed an unfair labor practice in refusing to bargain with the union. His decision is currently pending on appeal to the Board. But until the decision is affirmed, and becomes final after judicial review (if sought), U.S. Marine will benefit from a reversal of the district judge's order of civil contempt. That reversal will enable it to do things it wants to do until the unfair labor practice proceeding ends in a final order adverse to it.

■■ So the case is not moot; but there is another jurisdictional issue. The general rule is that an order of civil contempt is not appealable unless directed against a nonparty to the litigation. *Doyle v. London Guarantee & Accident Co.*, 204 U.S. 599, 607–08, 27 S.Ct. 313, 315–16, 51 L.Ed. 641 (1907); *In re Witness Before Special October 1981 Grand Jury*, 722 F.2d 349, 351

(7th Cir.1983); 15 Wright, Miller & Cooper, Federal Practice and Procedure § 3917 (1976); *id.*, 1986 Supp. So stated, the rule is subject to powerful criticism. See, e.g., 15 Wright, Miller & Cooper, *supra*, at pp. 622–26. The fault, however, lies in the statement of the rule rather than the practice of the courts. A blanket rule against appealing orders of civil contempt would make no sense. Such an order may, for example, be final. This is particularly likely where the order is issued in a post-judgment proceeding, see, e.g., *Vincent v. Local 294, Int'l Brotherhood of Teamsters*, 424 F.2d 124, 128 (2d Cir.1970), or—a closely related category—where the contempt proceeding is the only pending proceeding, see, e.g., *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir.1983). When not final in the strict sense of winding up the whole litigation in the trial court, an order of civil contempt may still be final enough to permit appeal under the collateral-order doctrine, as in *Motorola, Inc. v. Computer Displays Int'l, Inc.*, 739 F.2d 1149, 1154 (7th Cir.1984); ·this is the rationale for allowing nonparties to appeal orders of contempt against them right away. Even when not final in any sense recognized by 28 U.S.C. § 1291 (the "final judgment" rule), an order of civil contempt may still be appealable under another statute, such as 28 U.S.C. § 1292(a)(1) (immediate appeal of preliminary injunctions), as in this case. Rather than talk about a rule against the appealability of civil contempt orders that is riddled with exceptions, see, e.g., *Drummond Co. v. District 20, United Mine Workers of America*, 598 F.2d 381, 383–84 (5th Cir.1979); *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 976 (11th Cir.1986), it would promote clarity to say that an order of civil contempt is appealable if and only if it is either final for purposes of section 1291 or appealable under a statute allowing the appeal of interlocutory orders.

■■ If the contempt order that U.S. Marine seeks to appeal had wound up the proceedings in the district court, its appealability would be unquestionable under the simple test just proposed. The order is not, however, a final order in this sense.

The reason is not, as might appear, that the Board's section 10(j) proceeding will remain alive in the district court until the injunction that the court found U.S. Marine to have violated expires—that is, until the company has been authoritatively determined to have committed an unfair labor practice by refusing to bargain with the union. Whenever an injunction is issued, the court that issued it retains jurisdiction, explicitly or implicitly, to enforce, modify, or dissolve it. Thus, so long as an injunction remains in force, the proceeding in which it was entered is not really final; hence an order in that proceeding, such as this order of civil contempt, is not really final. But the possibility of supplementary proceedings does not deprive an injunction of finality within the meaning of 28 U.S.C. § 1291. *University Life Ins. Co. v. Unimarc Ltd.*, 699 F.2d 846, 849 (7th Cir.1983). The post-judgment phase of an injunctive proceeding is treated just like the collection phase in a suit for damages; a judgment for damages is, of course, a final and appealable order, even though supplementary proceedings, whether in the same or a different court, may prove necessary to collect the damages. U.S. Marine is not appealing from the injunction but from a subsequent order; but so long as no further proceedings other than enforcement are contemplated in the district court, that order is itself a final order.

■ There is, however, a second reason for questioning the finality of the contempt order: the court did not determine the amount of attorney's fees to award the Board, but left that for later determination. Ordinarily, of course, the fact that attorney's fees have not been awarded does not prevent the underlying judgment from becoming final; the attorney's fee proceeding is regarded as collateral. See *Exchange Nat'l Bank of Chicago v. Daniels*, 763 F.2d 286, 292–94, on rehearing, 768 F.2d 140 (7th Cir.1985). Here, however, the judgment sought to be appealed includes an order to pay attorney's fees but no specification of the amount of fees to be paid, suggesting an analogy to the case where liability is determined but the quantification of damages is left for later deter-

mination—a classic example of a nonfinal order. See *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976). It is true that the amount of attorney's fees was later determined and in fact paid, but if there was no final order when U.S. Marine filed its notice of appeal, the notice was premature, and did not confer appellate jurisdiction. *United States v. Hansen*, 795 F.2d 35 (7th Cir.1986). U.S. Marine would have had to file a later, timely notice when the fees were quantified—which it didn't do.

Clearly, if the only order sought to be appealed was an order to pay attorney's fees in a not yet determined amount, *Wetzel* would require the dismissal of the appeal for lack of finality. However, when such an order is ancillary to an appealable order, we have allowed it to be appealed too on "the principle that 'a court of appeals may, in the interest of orderly judicial administration, review matters beyond that which supplies appellate jurisdiction.'" *Bittner v. Sadoff & Rudoy Industries*, 728 F.2d 820, 826 (7th Cir.1984), quoting *Scarlett v. Seaboard Coast Line R.R.*, 676 F.2d 1043, 1052 (5th Cir.1982). Cf. *Barrington Press, Inc. v. Morey*, 816 F.2d 341, 342 (7th Cir.1987). At worst, moreover, the fact that the district court did not fix the amount of attorney's fees before the notice of appeal was filed would prevent us from reviewing paragraph (5) of the order, the paragraph that directs U.S. Marine to pay the Board its attorney's fees. For as explained in *Daniels*, we treat the attorney's fee phase of a litigation as a separate proceeding when deciding whether we have jurisdiction of an appeal from an order dealing with the merits phase. See also *Budinich v. Becton Dickinson & Co.*, 807 F.2d 155 (10th Cir.1986) (per curiam).

■ Even if the order of civil contempt as such were not final, we would have jurisdiction of this appeal, or at least of the central part of it. Paragraph (4) of the order is an injunction against further meetings of the Safety & Progress Committee. The district judge actually said he was "permanently enjoin[ing]" these meetings.

Injunctions are appealable regardless of finality, see 28 U.S.C. § 1292(a)(1), and, consistent with our view regarding the appealability of orders of civil contempt, we hold that an injunction does not cease to be appealable under section 1292(a)(1) merely because it is contained in an order for civil contempt.

We need not labor the jurisdictional issue further. Paragraph (4) is the central provision of the contempt order; if it is valid, U.S. Marine has no grounds for quarreling with any other provision of it. So let us turn to the merits of paragraph (4).

■ The injunction that the district court issued and later found U.S. Marine to have violated required the company to bargain in good faith with the union over wages and other terms and conditions of employment, and only with the union—that is, to respect the union's status under federal labor law as the employees' exclusive bargaining representative. In effect, the injunction wrote statutory prohibitions into a decree enforceable by contempt. See 29 U.S.C. §§ 158(a)(1), (5). Not having appealed from the grant of the injunction, U.S. Marine cannot argue that it is too vague to be enforced, compare *NLRB v. Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807, 810–11 (7th Cir.1962), or that it violates Rule 65(d) of the Federal Rules of Civil Procedure, which requires that an injunction "shall describe in reasonable detail ... the act or acts sought to be restrained." Furthermore, in ordering U.S. Marine to comply with the relevant provisions of the National Labor Relations Act the injunction implicitly incorporated the basic principles that the Labor Board and the courts have developed to guide the application of these provisions. The district court was not required to spell out those principles in the injunction; it was enough that the injunction, by using familiar terms of art, evoked those principles. See *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 240, 95 S.Ct. 926, 936, 43 L.Ed.2d 148 (1975); *NLRB v. Maine Caterers, Inc.*, 732 F.2d 689, 690–91 (1st Cir.1984); *Motorola, Inc. v. Computer Displays Int'l, Inc., supra*, 739 F.2d at 1156. Among them is the

principle that the employer is not to go behind the union's back and negotiate with individual workers, nor otherwise to undermine the union's status as exclusive bargaining representative. See, e.g., *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 683–85, 64 S.Ct. 830, 832–33, 88 L.Ed. 1007 (1944); *NLRB v. Pratt & Whitney Air Craft Division*, 789 F.2d 121, 134–36 (2d Cir.1986); *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1092–95, 1100, 1103 (1st Cir.1981); *J.P. Stevens & Co. v. NLRB*, 623 F.2d 322, 325–26 (4th Cir.1980); *NLRB v. Triumph Curing Center*, 571 F.2d 462, 471 (9th Cir.1978).

■ The finding of contempt rests on three practices in which U.S. Marine engaged while the injunction was in force. First and least, U.S. Marine took a month to supply information requested by the union. The information in question was the amount of money that each worker had been credited with under the company's profit-sharing plan. The company had disclosed the aggregate figure but the union wanted it broken down on an employee-by-employee basis. The company asked the union why the individual breakdown was relevant, the union told it, and six days later the company supplied the information. The request to explain the relevance of the information was what caused the delay that the district court found violated the injunction. We disagree that this was a violation. The relevance of the information was not obvious, cf. *Atlas Metal Parts Co. v. NLRB*, 660 F.2d 304, 310 (7th Cir.1981), and since disclosure would (however slightly) compromise the privacy of the employees, cf. *NLRB v. Certified Grocers of Illinois, Inc.*, 806 F.2d 744 (7th Cir.1986), the company was entitled to ask what its relevance was before disclosing it. There is no suggestion that the delay of several weeks undermined the union's performance of its bargaining role. Moreover, at the time the information was requested bargaining had broken down, the parties having deadlocked. For this reason the district judge held that U.S. Marine had not violated the injunction by refusing to bargain over profit sharing. But, if so, how could it have violated the injunction by refusing to sup-

ply information requested only for use in such bargaining?

The second and third practices that the district judge found to be contumacious arose out of the meetings of the Safety & Progress Committee and out of the company's annual profit-sharing meeting with its employees. To simplify exposition we shall assume that everything which troubled the district judge occurred in the meetings of the Safety & Progress Committee; it is not the label but the content of the meetings that matters.

U.S. Marine had created the Safety & Progress Committee shortly after buying the plant from Chrysler. The committee consisted of employee representatives, appointed by U.S. Marine, from each of eleven work areas. Each representative was required to meet with the other employees in his area every six weeks during regular working hours; attendance by those employees was compulsory too. At each meeting the representative solicited questions about any matter. No subject was off limits. The area representative wrote down the questions and circulated them to the pertinent managers. Two weeks after each area meeting the committee met with senior members of management, who answered the questions. The questions and answers were then posted on bulletin boards in the plant. The meetings continued after the district court issued the injunction.

Some of the questions asked at the post-injunction meetings were really just complaints about hazardous or uncomfortable working conditions, such as excessive heat or cold, paint fumes, broken windows, skin irritations caused by a coolant, and pigeon droppings on the loading dock. Others concerned matters central to the collective bargaining process, including wages, overtime pay, life insurance and other fringe benefits, and vacations. Sometimes the company would answer that it couldn't answer, because of the injunction. Thus, in response to a question whether the base pay rate would increase or stay the same, the company answered, "We had planned to review pay rates periodically and adjust

them. We are now under court order to bargain with the union on wages and other conditions of employment." But usually the company would either give a full answer or say it was taking the matter under advisement. In response to a request that vacation days count toward time worked for purposes of overtime, the company said it was "considering" the matter. It said it would consider a request for a 15–minute paid lunch hour "along with the demands put forth by the union bargaining committee." To a request for a Christmas Eve or New Year's Eve holiday the company responded that it would "consider this along with all other requests for benefit changes." It refused to grant a request for two weeks' unpaid vacation on the ground that it could not "allow two weeks unpaid and still achieve our production goals." There was more in this vein but there is no need to lengthen this opinion with additional examples.

The district court thought all these exchanges improper. We disagree. It is important to understand that U.S. Marine and the union never did negotiate a collective bargaining contract. They bargained, but unsuccessfully. This of course did not entitle the company to disregard the union and bargain individually with the employees. It could do that only if the union, having failed to obtain a contract and thus demonstrated its own ineffectuality, was later decertified as the workers' bargaining representative because the workers lost confidence in it. There has been no decertification. All that the breakdown in bargaining—the "impasse," in the jargon of labor law—entitled the company to do was to make changes consistent with the proposals that it had placed on the table during the negotiations. See Gorman, Basic Text on Labor Law 445–54 (1976).

However, as a result of the parties' failure to negotiate a collective bargaining agreement, no regular procedure existed for processing grievances. A collective bargaining agreement usually provides a procedure by which workers' complaints about violations of the contract are made in the first instance to union representatives,

who if they think the complaint has any merit will then try to resolve it by discussion with management or, failing that, by arbitration, or (in the rare case where the contract has no arbitration clause) by litigation or a strike. A "grievance" in such a setting is simply a complaint that the collective bargaining contract has been violated. See, e.g., *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 812 (7th Cir. 1985); Gorman, *supra,* at 389. When there is no agreement defining the workers' rights, and no procedure for vindicating those rights, the term has a less precise signification. The company is not permitted to negotiate with the individual worker; negotiation is the union's prerogative. But the company is not forbidden to respond to complaints about pigeon droppings or excessive cold or other hazards or discomforts. Indeed, it is derelict in its responsibility for the workers' safety and comfort if it fails to respond. Moreover, the bargaining process would become constipated if every petty complaint that a worker might have about his working conditions had to be taken up in a bargaining session between the company and the union—especially when the parties, because they have reached a deadlock, are not meeting to bargain.

There is a difference between an individual complaint and negotiation with an individual. A worker is not forbidden to speak to his foreman or to some other supervisor about a safety hazard or some related problem, without a union representative's being present; but he cannot ask the supervisor for a higher wage or greater benefits or shorter working hours or a longer vacation. The first case does not involve a request for a negotiable concession, the sort of thing that might be in issue in the give-and-take of a bargaining session. The second does. If the line is not always clear, still it is clear that U.S. Marine crossed it repeatedly. When a worker says there should be additional vacation days or that there should be a paid lunch hour, he is making a proposal to change the terms and conditions of employment, not just requesting the removal of some hazard or discomfort that he has a right to expect the com-

pany to remove; and by making such a proposal he steps on the union's toes. If the company responds to the proposal (instead of telling the worker that it is a matter that he must take up with his union representative), it is bargaining outside of the bargaining framework established by the National Labor Relations Act for plants in which the union is the workers' exclusive bargaining representative. The purpose of exclusive representation is to enable the workers to speak with a single voice, that of the union. This purpose is thwarted if the company is allowed to negotiate with individual workers over the same topics that the union is negotiating with the company over. As we have said, if the discussion concerns some petty complaint that the company has merely to be apprised of to be willing to remove—a complaint about working "conditions" but not the sort of complaint over which union and employer bargain—the worker by asking that the condition be corrected and the company by agreeing to do so are not circumventing the union's role as exclusive bargaining agent; the union probably doesn't want to be troubled by such matters before the contract is negotiated and the grievance machinery established. But incentive pay, paid lunch hour, and vacation pay are not petty complaints; they are matters central to negotiating a contract between union and employer.

Sometimes U.S. Marine refused to respond to the worker's complaint but couched its refusal in terms that might be thought to imply that the union was preventing the satisfaction of the worker's demand. That is apparent in the answer to the question about base pay rates. Undermining the union in this way is particularly damaging because, combined with an obdurate bargaining position which results in deadlock, it may persuade the workers that the union is futile and thus set the stage for a decertification proceeding. So while the company did not violate the injunction by its delay in responding to the request for individual profit-sharing information or by receiving and acting on complaints about safety and health hazards and about

discomfort, it did violate it by entertaining proposals by individual workers for changes in terms and conditions of employment and by responding to individual questions in ways calculated to undermine the union's position in the workers' eyes. The Safety & Progress Committee was the principal agency of this violation and the district court was therefore entitled to enjoin further meetings of the committee in order to assure compliance with the injunction. Of course if the company wants to make the committee a forum exclusively and explicitly concerned with soliciting suggestions for raising productivity and complaints about the safety, health, and comfort of the workplace, it may do so within the limits set forth in this opinion.

For the reasons we have explained, the provision in paragraph (4) that forbids U.S. Marine to "solicit questions or grievances from employees" clearly goes too far and must be stricken. We also think excessive the prohibition in that paragraph against "remarks reflecting an anti-union animus." The First Amendment to the Constitution, section 8(c) of the National Labor Relations Act, 29 U.S.C. § 158(c), and even the injunction that the district judge held U.S. Marine in contempt of permit the company to harbor and express animus (hostility) toward the union. Such expressions are the heart of an employer's campaign in a representation election, see, e.g., *NLRB v. Marine World USA*, 611 F.2d 1274, 1277 (9th Cir.1980), and are not forbidden just because the election is over and the union has won. Indeed, had no injunction been issued, it would be clear that the company could publicly question the value of the union and urge the workers to repudiate it. "The expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefits." 29 U.S.C. § 158(c). See *Roper Corp. v. NLRB*, 712 F.2d 306, 311 (7th Cir.1983). But having been enjoined from violating the Act and then having gone ahead and violated it, a company must expect some fencing in. Cf. *FTC v. National Lead Co.*, 352 U.S. 419, 431, 77 S.Ct. 502,

510, 1 L.Ed.2d 438 (1957); *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1393 (7th Cir.1986). Having done what it could to undermine the union, U.S. Marine must accept some limitations on what would otherwise be its constitutional and statutory rights to express its frank opinion about collective bargaining. But all that reasonably can be forbidden to the company is the making of statements that undermine the union's role as the workers' exclusive bargaining representative, once the union has been elected to that role. The company may not tell the workers that it would like to respond positively to their requests for better wages and terms of employment but that the union is standing in the way; but beyond that it is free to express its hostility or "animus" toward the union.

We remand the case to the district court with instructions to modify paragraph (4) of its order in accordance with this opinion. Otherwise we affirm. No costs will be awarded in this court.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.