LEONARD RUDD ET UX. *v.* GUNNARD ANDERSON ET AL.

[No. 1271A275. Filed August 9, 1972. Rehearing denied September 13, 1972. Transfer denied January 22, 1973.]

*Paul Reed,* of Knox, for appellants.

*Richard F. Joyce, Kizer and Neu,* of Plymouth, *Orville W. Nichols, Jr.,* of Knox, for appellees.

### STATEMENT ON APPEAL

STATON, J.—Leonard Rudd and Kathryn Rudd are appealing from a judgment which awarded Gunnard Anderson and Karl

Anderson, d/b/a G & K Anderson Construction, $18,802.62 upon their mechanic's lien foreclosure. The Rudds had engaged the Andersons to perform certain remodeling construction on their home located in Starke County, Indiana which is more particularly described as follows:

> "A tract of land commencing on the west line of Section 35 at a point 375 feet south of the northwest corner of Section 35, Township 33 North, Range 2 West of the second principal meridian, thence east 348 feet, thence south 125 feet, thence west 348 feet, thence north 125 feet to the place of beginning."

The modifications discussed before the remodeling work commenced totaled $35,200.00. After all remodeling had been completed which included considerable changes from the original remodeling plans, the Rudds paid Andersons $40,-000.00 and stated that they "couldn't justify" the additional charge of $17,977.92 for the time and materials claimed by the Andersons. A mechanic's lien was filed and foreclosed by the Andersons who received a judgment for $17,977.92 plus interest or $18,802.62. The trial court awarded attorney fees in the sum of $1,800.00. The motion to correct errors filed by the Rudds raises the following questions.

    I.  "The first issue presented for review is whether or not the court's decision permitting the Contractors to recover for the entire project on a time and material basis was supported by sufficient evidence upon all the necessary elements of the plaintiff's complaint."

   II.  "The second issue presented for review is whether or not the notice of mechanic's lien filed by the Contractors was in compliance with the mechanic's lien statute in that it did not contain in the body thereof, the names and addresses of the Contractors."

 III.  "The third issue presented for review is whether or not the amount of Contractors' recovery was excessive."

We affirm the trial court's judgment in the opinion which follows.

STATEMENT OF FACTS: Leonard Rudd, an automobile dealer in Knox, Indiana, and Karl Anderson, a contractor,

had their first meeting in the last part of 1968 or early part of 1969. Leonard Rudd testified as follows:

"Q. How did you and he happen to get together about it?

"A. Karl stopped in one day—I suppose you would call it shopping for a new truck, and so he wanted prices and I gave him a price—

"Q. I don't hear you.

"A. He wanted a price on a new truck and I gave him a new price, and if I remember right, several days later or a few days later anyhow, he came back to further negotiate the dealings on a truck and I sold him a new truck. I believe this must have been in '68.

"Q. My question now is when did you and he get together about the house. I don't care how you happened to get together before; whether you sold him a car or didn't.

"A. I said something to him when I found out he was a contractor.

"Q. When did you do that?

"A. This was in—I don't recall whether it was in the last part of '68 or the early part of '69, but, anyhow, I told him that we had thought about it, and then later Karl came back and asked if we had thought any further about re-doing the house and adding to it, so it proceeded to the place where we was pretty interested, and he said that he had a fellow that would draw some plans and meet with us if we wanted to and tell him what we desired, and he was a good draftsman and had good ideas and all that.

"Q. Did there come a time when this fellow he said he would bring over did come over?

"A. Yes.

"Q. Who did come with him?

"A. A fellow by the name of William Thayer, I believe.

"Q. That is the draftsman who came: William Thayer. Did Karl Anderson come with him?

"A. Yes."

Several remodeling proposals were discussed by the Rudds and Anderson in the late spring of 1969. One proposal dated May 20, 1969 totaled $28,200.00 and a second dated June 13, 1969 totaled $35,200.00 with a fireplace and quarry tile or $32,200.00 without. Neither of these written proposals were

signed by the Rudds and Anderson. When all of the remodeling construction had been completed, the actual remodeling cost, taking into account the trial court's judgment, totaled $57,-977.92, which is approximately twice the amount discussed in the two above proposals. Before Anderson commenced the remodeling construction, he had a conversation with Leonard Rudd in his office at Knox, Indiana. Anderson testified:

"Q. And what kind of a conversation did you have then?

"A. He said he was sorry but he felt that it was more than he wished to spend but that he would like to do some work on the house to fix it up and renovate it and he said 'If you have some time go out and look at it.' And this is what we did.

"Q. You went out to look at the house on that particular day. What kind of a conversation did you have with the defendant Leonard Rudd there?

"A. At that time he said, 'let's start the job as if we were going to go ahead,' 'but' he said, 'we won't put on any new extensions.' There is a portion of the house that had a closed in porch. He said, 'We will remove this, fill in the roof and—

Mr. Reed: I am sorry, I didn't hear.

Witness: At that time we went to Mr. Rudd's house. He had a closed-in porch and this portion of the work had to be done for the new part. It was concrete slab and some blocks, and so forth for floors, and he suggested at that time that we move that and extend the living room and put a larger living room, and then we would go from there; if we wanted to do more to the inside room, we would. So we started with those intentions of filling out the living room.

"Q. Did you start to do the work?

"A. It was a day or so, I believe, and we started in.

\* \* \*

"Q. Did you ever have any conversations prior to the time of starting this work about an hourly rate?

"A. Yes, we did.

"Q. When and where was that, to the best of your ability?

"A. It was at the house. It was at the house. I asked Mr. Rudd—he asked me about how much it would cost to put—

"Q. Speak up.

"A. Mr. Rudd asked me how much it would cost to fill out

the living room and I said, 'Really, I can't set down a definite figure.' At that time I made an estimate. This was all. I don't even recall what it was—

"Q. Speak up.

"A. It was only a matter of a few days until other decisions had to be made, but then we talked then about four-fifty an hour for the carpentry work.

"Q. What did you tell him about the rate, if anything?

"A. I told Mr. Rudd that we would do the carpentry work on it if he wanted it that way, time and material, or we would do the original contract by the contract, or we would just work for four-fifty an hour.

"Q. What did he say then?

"A. Nothing very—really very definite. He said, 'All right, let's go ahead and start this;' inasmuch as I had suggested a price for filling out the living room he said, 'Let's go ahead and do this portion and we will see how it goes.' "

The remodeling construction work was commenced and there were approximately twenty-nine [29] changes from the proposals which had been previously discussed. At least fifteen [15] of these changes were substantial changes. The Rudds paid $40,000.00 to Anderson for the completed remodeling construction, but they refused to pay the adidtional $17,977.92 claimed by Andersons. Anderson's Exhibits 10 and 11 show that $19,705.50 of labor at the rate of $4.50 per hour had been expended to complete the remodeling construction. Andersons filed a mechanic's lien and foreclosed. The trial court awarded Andersons a judgment in the sum of $17,977.92 plus interest and attorney fees. A motion to correct errors was filed by the Rudds and the first of the three questions raised is stated below:

STATEMENT OF LAW:

I.

The first question or contention of error raised in the Rudds' motion to correct errors is:

"The first issue presented for review is whether or not the court's decision permitting the Contractors to recover for

the entire project on a time and material basis was supported by sufficient evidence upon all the necessary elements of the plaintiff's complaint."

This contention's primary premise is that there was a special contract for the remodeling construction completed, and the secondary premise is that the special contract should control extra remodeling construction on a time and material basis. The Rudds cite the following authority in support of this proposition: *McKinney* v. *Springer* (1851), 3 Ind. 59; *Knab Co.* v. *St. Mary's Hospital, Inc.* (7th Cir. 1961), 286 F. 2d 854; and *Rebekah Assembly* v. *Pulse* (1910), 47 Ind. App. 466, 92 N. E. 1045, 94 N. E. 779.

Assuming *arguendo* that a special contract price of $35,-200.00 had been agreed upon by the Rudds and Anderson for the originally planned remodeling construction, the Rudds have not persuaded us that these facts should not be controlled by those cases which hold that where there have been so many substantial changes to the special contract that it can no longer be used to determine the value of the work done, then reasonable value may be used. Cases enunciating this general rule of law have employed such terms as *abandonment, identity* and *feasibility* in relationship to the original special contract. The early cases held that there was an *abandonment* of the original special contract. *Norton* v. *Browne* (1883), 89 Ind. 333. Later cases relied upon being unable to identify, by special contract, the finished construction. *Cleveland, Cincinnati, Chicago & St. Louis R. R. Co.* v. *Moore* (1907), 170 Ind. 328, 356, 82 N. E. 52, 84 N. E. 540. Recent cases have relied upon the feasibility of using the special original contract. *Prewitt* v. *Londeree* (1966), 141 Ind. App. 291, 216 N. E. 2d 724. These cases are saying the same things in different terms. Whenever a special contract provides an aggregate price for specific construction including labor and materials, and cumulative changes no longer appear to be an appendage of the original special contract, reasonable value is the only feasible test of total value for the total construction.

This suggests that the issue to be considered here is not whether ". . . the contract price should have governed, so far as the work done under the special contract." *Garver* v. *Daubenspeck* (1864), 22 Ind. 238. On the contrary, the issue is whether there have been ". . . so many alterations [to the original contract] that it would not be feasible to determine the amount owing for the construction based upon the . . . contract price." *Prewitt* v. *Londeree, supra,* 141 Ind. App. at 316-317. *Prewitt, supra,* stands for the proposition that:

> ". . . [T]he parties should be bound by the contract price, . . . unless, as here, there apparently were so many alterations that it would not be feasible to determine the amount owing for the construction based upon the . . . contract price." 141 Ind. App. at 316-317.

The authorities that we have examined would suggest the following guidelines for the trial court when confronted with a special contract setting forth an aggregate price for the construction to be done:

1. Determine whether there have been substantial changes, alterations, and modifications to the original special contract.
2. Determine whether cumulative changes and modifications have remained an appendage of the original special contract.
3. Determine whether the owner has consented, either expressly or impliedly, to the changes.
4. Determine whether any fixed price for the cost of the changes or modifications was agreed upon by the parties.
5. Determine whether the contractor had informed the owner that the changes would cost more; or determine whether the owner should have known that the changes would have cost more.

Examining the evidence in the light most favorable to the Andersons and the evidence that supports the trial court's judgment, we conclude, using the above guidelines, that:

1. There were at least 15 substantial changes included in the 29 changes requested by the Rudds.
2. The labor and materials involved for the changes exceeded the costs of the original contract. The changes

had grown into a contractual body of their own and were no longer an appendage of the original contract.

3. The Rudds admitted that all the work was done with their consent with the exception of the electrical work which we will comment on later in this opinion.

4. No price was agreed upon as to the changes made.

5. The Rudds were informed several times that the numerous changes being made would cost extra.

The evidence supports the trial court's determination that the measure of value for the total remodeling construction work is the reasonable value of the work. There was expert testimony that the charges made for the labor and materials were reasonable and that the workmanship was average or above average.

Any evidence offered by the Rudds to refute this evidence went only to the weight and credibility. On appeal we cannot weigh the evidence or determine the credibility of witnesses. *City of Indianapolis* v. *Schmid* (1968), 251 Ind. 147, 240 N. E. 2d 66; *Turner* v. *State* (1972), 258 Ind. 267, 280 N. E. 2d 621; *Wm. J. & M. S. Vesey, Inc.* v. *Hillman* (1972), 151 Ind. App. 388, 280 N. E. 2d 88. The evidence presented to the trial court was sufficient to show that it was no longer feasible to use the original contract price to determine the amount of compensation due the Andersons. The evidence further supports the determination by the trial court that the cost of the entire project was the reasonable value thereof.

## II.

The Rudd's second contention of error is:

"The second issue presented for review is whether or not the notice of mechanic's lien filed by the Contractors was in compliance with the mechanic's lien statute in that it did not contain in the body thereof, the names and addresses of the contractors."

The above contention of error is not entirely accurate. The record shows that the names of the Contractors were contained

within the Jurat of the single page "Notice of Mechanic's Lien." The address of Andersons is at the bottom of the page where the name and address of the attorney preparing the instrument is placed.

The Rudd's contention is that the "Notice of Mechanic's Lien" does not strictly comply with the statute since the address is below, and not above, the Jurat. The particular part of the statute, IC 1971, 32-8-3-3; Ind. Ann. Stat. § 43-703 (Burns 1971 Supp.), is as follows:

> "Any person who wishes to acquire a lien . . . shall file . . . a sworn statement in duplicate of his intention to hold a lien upon such property for the amount of his claim, specifically setting forth the amount claimed, the name and *address* of the claimant and the name of the owner, and shall give legal description, street and number, if any, of such lot or land . . ." (Our emphasis).

This trivial error will not defeat the lien. This Court held in *Cline* v. *Indianapolis Mortar and Fuel Co.* (1917), 65 Ind. App. 383, 388, 117 N. E. 509:

> "It has also been held that a lien will not be defeated by reason of an unintentional misstatement *or a trivial error,* . . . in the notice, where the defect is not misleading; and that only such misstatements or inaccuracies in the notice as are calculated to mislead others should defeat the lien, if there has been substantial compliance with the requirements." (Our emphasis.) (Citations omitted.)

The Rudds do not contend that they were misled by the Andersons' address being at the bottom of the single page notice of mechanic's lien. The strict construction relied upon by the Rudds goes to ". . . determining the persons entitled to acquire and enforce such liens, but, being remedial in character, they should be liberally construed, [the terms of the statute] in order to carry their object into effect in giving a lien to those entitled to their benefits." *Cline, supra,* 65 Ind. App. at 387.

III.

The Rudds have presented their third and final error as follows:

"The third issue presented for review is whether or not the amount of Contractors' recovery was excessive."

Three grounds are relied upon by the Rudds in support of this contention of error. The grounds are:

1. The trial court allowed recovery for the entire project on a time and materials basis;
2. The notice of filing a mechanic's lien was defective;
3. The court allowed plaintiffs to recover for material furnished and time spent in rewiring the entire house, and for the installation of plumbing which was not ordered by defendants, and was done without their knowledge or consent.

We have discussed at considerable length grounds 1 and 2 above as they apply to the facts. Only ground 3 will be discussed and no reference will be made to the plumbing since this was not argued in the brief and was further waived in oral argument. Ground 3 is primarily concerned with the electrical service change from a 60 amps service to a 200 amps service. Andersons' exhibit 330 show that $430.00 was charged for this change in service. The Rudds contend that they did not know of the proposed change in service. We note at page 360 of the transcript the following testimony: [Mr. Reed, attorney for the Rudds is cross-examining R. J. Robinson, an electrician.]

"Q. Mr. Robinson, I am going to ask you this question: You took a medicine chest out and you called attention to Mr. Rudd and said, 'This is not safe'?

"A. I don't believe I said it wasn't safe; I told him it wasn't right.

"Q. You told him it wasn't right, and he said if it isn't right, make it right. Isn't that what he said?

"A. Yes. Also the junction box in the kitchen he said the same thing about."

This uncontradicted testimony coupled with the Rudds own testimony at page 515 of the transcript: [Mr. Kizer, attorney for the Andersons is cross-examining Mr. Leonard Rudd.]

"Q. You never—Well, how often were you out there?
"A. About every other day.

would justify the trial court's finding that the Rudds knew of the change in service and such finding supports the inference that the Rudds gave their implied consent. Admittedly, there is other evidence which would give rise to a contra inference. However, on appeal, our Court cannot weigh the evidence nor resolve the questions of credibility of witnesses. *Wm. J. & M. S. Vesey, Inc.* v. *Hillman* (1972), *supra.* We cannot reverse the trial court, who is the trier of fact, unless the finding of fact by the trial court is "clearly erroneous." See Rule A.P. 15(M) of the Indiana Rules of Procedure.

The judgment of the trial court should be and the same hereby is affirmed.

Hoffman, C.J. and Sharp, J., concur.

NOTE.—Reported in 285 N. E. 2d 836.