123 F.3d 616
 KOKOMO TUBE COMPANY, a unit of Ultra-Cast, Incorporated,
Plaintiff-Appellant,
v.
DAYTON EQUIPMENT SERVICES COMPANY, Defendant-Appellee.
DAYTON EQUIPMENT SERVICES COMPANY, Plaintiff-Appellee,
v.
TRIPLE S HOLDINGS, INCORPORATED, Defendant-Appellant.
 No. 96-2993.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 27, 1997.
Decided Aug. 18, 1997.
 
 Jeffrey D. Spilman, Detroit, MI, for Plaintiff-Appellant.
 Robert J. Palmer (argued), E. Spencer Walton, Jr., May, Oberfell & Lorber, South Bend, IN, for Defendant-Appellant.
 Timothy W. Woods (argued), Thomas F. Lewis, Jr., Jones, Obenchain, Ford, Pankow, Lewis & Woods, South Bend, IN, for Defendant-Appellee.
 Before BAUER, WOOD, Jr., and ROVNER, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 Claiming consequential damages stemming from a static cast line not being installed in time for its factory's open house, Kokomo Tube Company brought a breach of contract action against the contractor for the job, Dayton Equipment Services Company. Dayton was not paid all that it charged Kokomo Tube for the project, so it, in turn, filed a counterclaim alleging breach of contract by Kokomo Tube. Dayton had also recorded a mechanic's lien on the property where Kokomo Tube is located when it became clear that Kokomo Tube would not be paying the balance it owed. Dayton brought an action against Triple S, the owner of the property, to foreclose on the mechanic's lien. The district court consolidated the cases. On December 4, 1995, the court entered judgment for Dayton and against Kokomo Tube in the sum of $112,606.65, plus attorneys' fees in an amount to be determined later. The district court also concluded that the judgment constituted a first lien on the property where Kokomo Tube is located and that Dayton was entitled to have the lien foreclosed against Triple S so that the property could be sold in satisfaction of Dayton's judgment. Kokomo Tube and Triple S appeal, bringing with them a bevy of contentions. We disagree with all of them and affirm.
 
 Background
 
 2
 In 1991, the Spilman family (Jeff, his father, and his uncle Gilbert) acquired the Kokomo Tube Company, a foundry located in Peru, Indiana. Kokomo Tube manufactures stainless steel centrifugally-cast tubing assemblies and static cast fittings. On January 16, 1992, Kokomo Tube representatives met with a Dayton representative to discuss Dayton's installation of a static cast line in the Kokomo Tube plant. Jeff and Gilbert Spilman, along with project consultant Gerry Scott, executive vice president Gene Huskins, maintenance manager Tim Gehle, and foundry manager Jim Aaron represented Kokomo Tube at the meeting. Craig Ellis represented Dayton.
 
 
 3
 The parties agreed that Dayton would acquire and install used equipment. Kokomo Tube already had some of the necessary parts, and Ellis stated that Dayton could get some other used equipment from Texas. Jeff Spilman stated that Kokomo Tube wanted the line installed in time for its open house on March 18, 1992. He also asked that Dayton hand over weekly invoices so that Kokomo Tube could track Dayton's progress and expenditures. Ellis said that he thought Dayton could complete the project by a week before the open house. When asked, the attendees' memories diverged over the cost of installing the line. Their recollections ranged from $40,000 to $100,000.
 
 
 4
 After the meeting, Ellis went back to Dayton's offices and composed an offer letter, dated January 22, 1992. The letter stated:
 
 
 5
 Pursuant to our meeting on January 16, 1992, concerning your Foundry No Bake Project, Dayton Equipment Services Company is pleased to provide the following proposal and scope of work to be performed as listed below.
 
 
 6
 1. Lay out and detail of the entire molding system and operation
 
 
 7
 2. The site requirements for air, water, water discharge and electrical service
 
 3. Sand reclamation installation
 4. Mixer, sand heater, silo installation
 5. Mold line equipment installation
 6. System interlock and debug
 
 8
 It is estimated that 1,816 man hours will be required to perform the above listed work. With a project crew of six men, this work could be completed within an eight working week time frame. As discussed, Dayton Equipment Services Company would provide four men and Kokomo Tube would provide two men. The cost of labor provided by Dayton Equipment Services would be $7,021.33 per week. This price includes labor cost, living expenses, travel and truck expenses. The crew provided by Dayton Equipment Services Company would be experienced in this type of installation and all efforts would be made to shorten the projected time frame. If Kokomo Tube would provide four men on this project, this would be a crew of eight men or four men for a two shift turn per day, [sic] It is estimated that this would allow for project completion in four weeks. This would equate a [sic] cost of $42,128.00 for Dayton Equipment Services' labor. Costs could be further reduced by performing as much fabrication work and machine repair as possible in our shop rather than on the job site. This would reduce travel and living expenses. Please note that the personnel provided by Kokomo Tube would have to be experienced to some degree in equipment installation, welding, pipe fitting or electrical runs. Most importantly they would need to be able to follow direction.
 
 
 9
 Work can be scheduled immediately on the reclaim system and mold line conveying system. Layout and detail of the system can be done concurrently. Delays in completion could be experienced by equipment delivery which could very likely make a March 11, 1992 start up unlikely. Dayton Equipment Services will aid and coordinate with Kokomo Tube to ensure the shortest possible project time frame.
 
 
 10
 It is understood that this proposal does not include any material. We will use whatever is available at your facility. We can use used beams, pipe, electrical apparatus, etc [sic] provided it is in good condition with no sacrifice to the quality of the installation. New material will be used where absolutely necessary. Such material can be provided by us. All material provided by us to Kokomo Tube will be charged at our cost plus 15% F.O.B. Dayton. Invoices of purchased material will be made available for your review.
 
 
 11
 Our terms for this project are progressive payments on a weekly basis, payable upon receipt of invoice. The invoice will be coupled with a job progression report signed off by your representative.
 
 
 12
 This proposal is good for sixty days.
 
 
 13
 I would like to thank all of you for your courtesy shown me during my visit to your facility and for allowing us to quote this work. We look forward to working with you. If you have any questions concerning this proposal do not hesitate to call.
 
 
 14
 After receiving the letter, Jeff Spilman called Ellis to remind him of how important it was that the project be completed by the date of the open house, March 18, 1992. On January 31, 1992, Kokomo Tube accepted Dayton's offer in its purchase order, which stated: "Time and materials as proposed. All material purchased to be approved in advance by Kokomo Tube Company."
 
 
 15
 Throughout January, Kokomo Tube had not decided whether the static cast line's conveyance system would be powered by gravity or electricity. Kokomo Tube did not decide to use electricity until the first week of February. Additional work was required in order to have the system run by electricity. As evidenced by a purchase order dated February 27, 1992, Kokomo Tube awarded the extra work to Dayton via a separate contract. Larry Trout, who worked for Dayton, took over the job of managing the project after Kokomo Tube's original consultant, Gerry Scott, left his job. Trout understood that Kokomo Tube was supposed to do the purchasing for the electrical project. Trout submitted a request to purchase controls to Tim Gehle, but by February 27, the controls had still not been ordered. On February 28, Trout and Jeff Spilman agreed that Trout should take over the ordering of equipment.
 
 
 16
 On February 28, Dayton ordered the electrical control cabinet for Kokomo Tube's conveyor line from a distributor known as Weaver. Weaver promised to deliver the cabinet by March 9. On March 6, Weaver reported that it could not ship the cabinet as promised because of a blizzard. After the blizzard subsided, Weaver still could not ship the cabinet on time because some of its parts were missing. Dayton did not seek out another distributor because it believed that the cost of securing another distributor would have been considerably higher than if it stuck with Weaver. On March 16, Weaver assured Trout that the cabinet was being shipped that night by overnight express. Weaver eventually shipped the cabinet by overnight express on March 17. The cabinet, however, was lost in transit. Dayton received the cabinet on March 25, after the date of Kokomo Tube's open house.
 
 
 17
 Shortly before the open house, Ellis informed Jeff Spilman that the line would not be in operation by March 18. Dayton assigned larger crews, but Spilman said that Kokomo Tube would not pay overtime. At the open house, Dayton "jerryrigged" the line so that it appeared to be operable to Kokomo Tube's guests. The display and performance did not quite live up to Kokomo Tube's expectations, but Kokomo Tube never claimed that it lost any business as a result.
 
 
 18
 The parties' relationship was never the same after the open house. Kokomo Tube was able to use some of the equipment in a limited capacity beginning around March 21, but disputes about overtime persisted. Dayton finally completed the line and left the plant on April 15. However, more than a few kinks had to be worked out. Dayton ultimately charged Kokomo Tube $235,887.93 for the project. Kokomo Tube paid $111,066.71, the amount which it believed it owed.
 
 
 19
 After Kokomo Tube repeatedly refused to pay the balance due, Dayton recorded a mechanic's lien on the property where Kokomo Tube is located on June 3, 1992. The mechanic's lien named Triple S Holdings, which owns the Kokomo Tube property and building and leases them to Kokomo Tube.[1]
 
 
 20
 On June 8, 1992, Kokomo Tube filed a breach of contract action against Dayton in Indiana District Court. Kokomo Tube sought consequential damages from Dayton's alleged breach in not fulfilling the contract terms by the time of the open house. Kokomo Tube also prayed for damages stemming from the repair work it was required to do on the equipment after Dayton finished the project.
 
 
 21
 In response to Kokomo Tube's breach of contract claim, Dayton filed a counterclaim on July 27, 1992, alleging that Kokomo Tube breached the parties' contract when it paid only part of the balance due. Dayton sought the balance between what it billed Kokomo Tube and what Kokomo Tube paid.
 
 
 22
 On November 11, 1992, in Indiana District Court, Dayton filed an action to foreclose on the mechanic's lien and it named Triple S as one of the defendants. On May 3, 1993, the court consolidated the two cases. Dayton subsequently filed two amended complaints on the foreclosure action, the last of which was filed on December 27, 1993. Neither complaint named Kokomo Tube as a party.
 
 
 23
 The district court entered an order as to both actions on November 14, 1995. In Kokomo Tube's action, the district court ruled in favor of Dayton, finding that Dayton was entitled to a judgment of $112,606.65, attorneys' fees and costs, and foreclosure of its mechanic's lien in its suit against Triple S. The district court withheld judgment in Kokomo Tube's case to assist in having an orderly proceeding if Kokomo Tube appealed. The district court also withheld judgment in Dayton's case against Triple S to allow Dayton to submit a form of judgment of foreclosure consistent with Indiana law. The court concluded that it would enter a final judgment in both cases on the same date and that Federal Rule of Civil Procedure 54(d)(2)(B) would govern the date by which Dayton would have to file its petition for attorneys' fees.
 
 
 24
 On December 4, 1995, the district court entered judgment in favor of Dayton in the amount of $112,606.65 plus attorneys' fees "in an amount to be determined" and costs. The district court also found that all of these amounts were secured by Dayton's mechanic's lien on the property where Kokomo Tube is located and which Triple S owns; that the judgment against Kokomo Tube constituted a first lien on the property; and that Dayton was entitled to have the lien foreclosed against Triple S and have the real estate sold in satisfaction of the judgment. The Clerk of the Court entered the judgment on the next day.
 
 
 25
 On December 14, 1995, Dayton filed a petition for attorneys' fees and expenses. On December 19, 1995, Kokomo Tube and Triple S filed a motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e). On July 12, 1996, the district court entered an order denying the motion and giving Triple S thirty days from the date of the order within which to file a response to Dayton's petition for attorneys' fees. Triple S never filed a response. Instead, Kokomo Tube and Triple S filed a notice of appeal approximately one month later. To date, the district court has not entered a specific amount of attorneys' fees to which Dayton is entitled.
 
 
 26
 On appeal, Kokomo Tube contends that the district court erred when it determined that time was not "of the essence" in Dayton's performance under the contract. Kokomo Tube also argues that the district court erred when it imposed the burden of proof on Kokomo Tube to establish that Dayton's performance of the contract was possible and when it excused Dayton's performance for economic reasons. Kokomo Tube further asserts that the district court erred when it found that the contract in question was a "time and materials" contract and not a "fixed price" contract. Finally, Kokomo Tube believes that the district court erred when it entered a judgment for attorneys' fees in favor of Dayton.
 
 Analysis
 A. The Award of Attorneys' Fees
 
 27
 Although this is the last issue raised by the parties in their briefs, we choose to discuss it first. At oral argument, the panel raised jurisdictional concerns regarding the district court's award of attorneys' fees to Dayton in an undetermined amount. Before we reach the merits of this appeal, we must first decide whether the district court entered an appealable final judgment, and, if not, what part, if any, of this appeal we have jurisdiction to decide.
 
 
 28
 Kokomo Tube and Triple S note that after it denied their motion to alter or amend judgment on July 12, 1996, the district court did not extend the time for filing a notice of appeal, which it could have done pursuant to Federal Rule of Civil Procedure 58. They argue that the district court's prior judgment is therefore appealable, pursuant to Federal Rule of Appellate Procedure 4(a)(4)(D). Dayton only addresses whether it should have been awarded attorneys' fees.
 
 
 29
 To be appealable, a decision must be final. See 28 U.S.C. § 1291. Generally, an award of attorneys' fees that does not fix the amount of the award or specify a formula that would allow for calculation of the award is not a final judgment within the meaning of § 1291. See, e.g., Vandenplas v. City of Muskego, 797 F.2d 425, 427-28 (7th Cir.1986); Hershinow v. Bonamarte, 735 F.2d 264, 266-67 (7th Cir.1984). An exception to this rule lies in the case where the initial order awarding fees is reviewed in conjunction with an appeal from a final judgment on the merits. See Bittner v. Sadoff & Rudoy Indus., 728 F.2d 820, 826-27 (7th Cir.1984). In this Circuit, Bittner is the leading case concerning finality and an award of attorneys' fees in an undetermined amount.[2] In Bittner, the plaintiff appealed from a final judgment for the defendant and from a separate order which, pursuant to an ERISA provision, awarded attorneys' fees to the defendant in an amount that had yet to be determined. Id. at 824. The order holding that the defendant was entitled to attorneys' fees was entered shortly after the final judgment, and the appeals from both the order and the judgment were consolidated. Id. at 826. In concluding that we had jurisdiction over the award of attorneys' fees in an indefinite amount, we reasoned that when such an order is ancillary to an appealable order, we have allowed it to be appealed on "the principle that 'a court of appeals may, in the interest of orderly judicial administration, review matters beyond that which supplies appellate jurisdiction.' " Id. (quoting Scarlett v. Seaboard Coast Line R.R., 676 F.2d 1043, 1052 (5th Cir.1982)).
 
 
 30
 We have a similar situation in this case, albeit with two differences. First, in this case, the district court consolidated Kokomo Tube's breach of contract claim and Dayton's counterclaim with Dayton's foreclosure action against Triple S at the outset of the suit, instead of the actions being consolidated for appeal. Second, the district court determined that Dayton was entitled to attorneys' fees at the same time and in the same document as it entered a judgment for Dayton on the merits. At first blush, these circumstances make this case seem a more compelling one than Bittner because they suggest that the issue of attorneys' fees is even more closely tied to the merits of the case than it was in Bittner. However, this "closeness" may not necessarily favor a finding of jurisdiction. It also suggests that the issue of attorneys' fees may be so intertwined with the district court's definite and appealable rulings that the judgment as a whole cannot be considered a final judgment.
 
 
 31
 Our concerns are assuaged by two cases that follow Bittner and are more closely analogous to the case before us, Szabo v. United States Marine Corp., 819 F.2d 714 (7th Cir.1987) and BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1088 (7th Cir.1994). In both of these cases, the award of an undetermined amount of attorneys' fees was part of the same order that made a final decision as to the merits of the case. In Szabo, the National Labor Relations Board had instituted unfair labor proceedings against U.S. Marine. The Board brought suit against U.S. Marine, asking the district court to grant an injunction to preserve the status quo at U.S. Marine until the Board had completed its proceedings. The district court granted the injunction from which U.S. Marine did not appeal. Two years later, the Board sought from the court a finding that U.S. Marine was in civil contempt of the injunction. The court issued an order in which it found U.S. Marine in contempt. In that same order, among other things, the court directed U.S. Marine to pay the Board the attorneys' fees and other costs reasonably incurred by the Board in pursuing the contempt proceeding, in an amount to be determined by the parties and, if not, by the court. Id. at 715-16. U.S. Marine appealed from the contempt order.
 
 
 32
 We found the contempt order sufficiently final to confer jurisdiction on us to decide both whether the district court should have entered the order and whether the district court should have directed U.S. Marine to pay the Board's attorneys' fees. Id. at 717. We noted that it would have been a different story if the only order sought to be appealed was one awarding attorneys' fees for an undetermined amount. In that case, we would have dismissed the appeal for lack of finality. Id.
 
 
 33
 In BASF Corp., as part of its original order, the district court concluded that BASF, the plaintiff, was entitled to at least some of its attorneys' fees, but the court did not determine an exact figure. BASF Corp., 41 F.3d at 1088. BASF then filed a motion for attorneys' fees. The district court rejected part of the requested amount and ordered the parties to develop a proper method by which the court could measure the remaining fees. Both parties appealed before the district court reached a figure and apparently before they supplied the court with the requested computation method. Id. BASF appealed as to damages. The defendant, Old World, cross-appealed as to the district court's finding of liability. Old World also objected to the court's award of damages and argued that BASF was not entitled to any attorneys' fees. Id. We concluded that it was "well-settled" that we had jurisdiction to review the district court's finding that BASF was entitled to attorneys' fees. Id. at 1099 (citing Lac Courte Oreilles Chippewa Indians v. Wisconsin, 829 F.2d 601, 603 (7th Cir.1987); Szabo, 819 F.2d at 717; Vandenplas v. Muskego, 797 F.2d 425, 429 n. 1 (7th Cir.1986)); see also Exchange Nat'l Bank of Chicago v. Daniels, 763 F.2d 286, 291-92 (7th Cir.1985). Thus, with ample precedent before us, we conclude that we have jurisdiction over this appeal.
 
 
 34
 Having found that we have jurisdiction, we now turn to whether the district court erred when it determined that Kokomo Tube was responsible for both the damages in Dayton's counterclaim against it and the attorneys' fees which Dayton incurred in bringing its foreclosure action against Triple S. Under Indiana law, if a plaintiff has a mechanic's lien and recovers a judgment, he can also recover attorneys' fees. Specifically Indiana's mechanic's lien statute provides:
 
 
 35
 In all suits brought for the enforcement of any lien under the provisions of this act [the mechanic's lien statute], if the plaintiff or lienholder shall recover judgment in any sum, he shall also be entitled to recover reasonable attorney's fees, which shall be entered by the court trying the same, as a part of the judgment in said suit, however, attorney fees shall not be recovered as part of the judgment against the property owner in any suit in which it is shown that the contract consideration for such labor, material or machinery has been paid, in fact, by the property owner or party for whom the improvement has been constructed.
 
 
 36
 Ind.Code § 32-8-3-14 (1982).
 
 
 37
 In Dayton's second amended complaint to foreclose its mechanic's lien, filed after the cases were consolidated, it asked for a judgment against Triple S for approximately $124,000 (the amount that Kokomo Tube allegedly owed it), attorneys' fees and costs incurred in pursuing the mechanic's lien foreclosure action, and an order foreclosing the mechanic's lien. The district court found both Kokomo Tube and Triple S liable. The court also determined that Dayton should recover the sum of damages, an undetermined amount of attorneys' fees, and costs from Kokomo Tube, but it did not expressly address Triple S's responsibility. Moreover, the court found that the sum was secured by Dayton's mechanic's lien against Triple S, that Dayton's judgment was a first lien on the property, and that Dayton was entitled to have the mechanic's lien foreclosed against Triple S and have the property sold in satisfaction of the sum.
 
 
 38
 While this appeal was pending, we received a request from the district court to correct a clerical error in its judgment, pursuant to Federal Rule of Civil Procedure 60(a). Rule 60(a) states:
 
 
 39
 Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative.... During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.
 
 
 40
 The district court asked for leave to replace the following portion of its judgment: "Plaintiff Dayton Equipment Services Company shall recover from Kokomo Tube Company, a unit of Ultra-Cast, Inc. the sum of $112,606.65 together with attorney fees and the costs of this action ..." with "Plaintiff Dayton Equipment Services Company shall recover from Triple S Holdings, Inc. the sum of $112,606.65 together with attorney fees and the costs of this action...."
 
 
 41
 In deciding whether Rule 60(a) applies, we have to distinguish "between changes that implement the result intended by the court at the time the order was entered and changes that alter the original meaning to correct a legal or factual error." Wesco Products Co. v. Alloy Automotive Co., 880 F.2d 981, 984 (7th Cir.1989). Rule 60(a) allows for the former but not the latter.
 
 
 42
 We find 60(a) applicable to this case. Near the end of its Memorandum and Order, entered on November 13, 1995, the district court stated that "Dayton also is entitled to attorney fees (in an amount still to be determined) in enforcing its mechanics lien, but because the amount due was not liquidated until this order, is not entitled to prejudgment interest." The district court also concluded, "Dayton is in [sic] entitled to judgment is [sic] its favor in the suit brought by Kokomo Tube (cause number 3:92-CV-349) and is entitled to judgment in the sum of $112,606.65, attorney fees and costs, and foreclosure or its mechanics [sic] lien in its suit (cause number 3:92-CV-707)." This is clear language indicating the district court's intent. Substituting "Kokomo Tube Company" with "Triple S Holdings, Inc." would implement the result intended by the district court at the time its order was entered. We grant the district court's Rule 60(a) motion.
 
 
 43
 B. Was Time of the Essence?
 
 
 44
 There is a modicum of Indiana case law concerning whether time is "of the essence" framed in the context of a contract action at law. The cases instead deal almost exclusively with actions in equity. One old case is cited and hotly contested by both parties. That case holds that time is of the essence when the contract contains a fixed time for performance. Ohio Valley Buggy Co. v. Anderson Forging Co., 168 Ind. 593, 81 N.E. 574, 577 (1907) ("At common law time is of the essence of a contract, and the performance, at the time fixed or prescribed, of the conditions or stipulations therein by the contracting party upon whom such duty rests, is indispensable unless waived by said party."). Whether a contract provides for a fixed time for performance is a factual determination and is reviewed for clear error. See Bocian v. Godinez, 101 F.3d 465, 468 (7th Cir.1996).
 
 
 45
 Dayton contends that nothing in the contract indicates that it promised completion by a particular date, and that, therefore, time was not "of the essence." Kokomo Tube counters that all parties involved knew that Dayton had a fixed time for performance, i.e., by the time of Kokomo Tube's open house on March 18, and that, therefore, time was of the essence. Kokomo Tube further asserts that we can consider various parties' statements that say as much because Indiana law does not restrict the district court from looking outside the four corners of the contract. Kokomo Tube cites Smith v. Potter, 652 N.E.2d 538 (Ind.Ct.App.1995), in support of this assertion. In Smith, the court held that a party can prove time to be of the essence by: (1) the terms of the instrument; or (2) evidence of circumstances establishing that the parties intended time to be a controlling element of the instrument. Smith v. Potter was an action in equity. We have an action at law.
 
 
 46
 Indiana law is on Dayton's side. "Where the terms of a contract are clear and unambiguous, we will not construe the contract or look at extrinsic evidence, but will apply the contractual provisions." Coates v. Jaye, 633 N.E.2d 334, 337 (Ind.Ct.App.1994). Generally, "[c]ontract language is given its plain and usual meaning, and a contract is ambiguous only if reasonable people would find the contract subject to more than one construction. The terms of a contract are not ambiguous merely because a controversy exists between the parties concerning its meaning." Eckart v. Davis, 631 N.E.2d 494, 497 (Ind.Ct.App.1994) (citations omitted).
 
 
 47
 In this case, the contract (Dayton's offer letter and Kokomo Tube's purchase order acceptance) shows no fixed time for performance. First, Dayton stated, "It is estimated that 1,816 man hours will be required to perform the above listed work." Dayton mentioned that it could complete the work within an "eight working week time frame" with a project crew of six men, four from Dayton and two from Kokomo Tube. Dayton then estimated the project's time frame if Kokomo Tube were to provide four men instead. Dayton also warned, "Delays in completion could be experienced by equipment delivery which could very likely make a March 11, 1992 start up unlikely." Dayton stated that it would coordinate its efforts with Kokomo Tube to ensure the shortest possible project time frame. This is language of caution and estimation, not certainty. Ellis ended Dayton's letter by stating that the proposal was good for sixty days. This, too, does not square with Kokomo Tube's position that Dayton's letter promised performance by the date of Kokomo Tube's open house; for the open house was fewer than sixty days from the date of Dayton's letter. Finally, after receiving Dayton's letter, Jeff Spilman called Ellis to remind him of how important it was that the project be done by the March 18 open house, but over a week later, Kokomo Tube issued its purchase order to Dayton: "Time and material as proposed...." With that, the contract was formed. If Kokomo Tube felt so emphatic about that date or uneasy about the language of estimation employed by Dayton, it could have insisted that there be a fixed time for completion inserted in the contract.
 
 
 48
 The plain language of the contract makes clear that there was no fixed time for performance. We therefore need not, and should not, drift from its four corners. That the parties debate the contract's meaning does not compel us to look beyond its plain language. The district court concluded, "This is not the stuff of which 'time is of the essence' provisions are made." See Orto v. Jackson, 413 N.E.2d 273, 274 (Ind.Ct.App.1980) (finding fixed time for performance where sellers agreed to complete construction ninety days after start of construction). We agree with that finding.
 
 
 49
 C. Impossibility--Burdens of a Procedural and Economic Nature
 
 
 50
 Kokomo Tube argues that the district court erred as a matter of law when it imposed the burden of proof on Kokomo Tube to establish that performance by the time of the open house was possible, instead of requiring Dayton to prove its impossibility. In addition, Kokomo Tube contends that the district court impermissibly excused Dayton's late work for economic reasons. We disagree with both assertions.
 
 
 51
 1. Whither burden shifting?
 
 
 52
 First, the district court did not couch its opinion in terms of impossibility of performance. The court stated that even if Dayton's letter rendered time of the essence, Dayton did not breach the contract because its performance was not the sole, or even primary, reason the line was not completed by the time of the open house. The court, having already found the contract provided no fixed time for performance and that time therefore was not of the essence, was merely speaking arguendo. Specifically, the court found that the decision to run the static line by electricity was entirely within Kokomo Tube's control; that the decision was made in early February, after the formation of the parties' underlying contract; and that the decision was the subject of a second, separate contract, which was not at issue in Kokomo Tube's breach of contract action.
 
 
 53
 In its opinion on Kokomo Tube and Triple S's Rule 59(e) motion, the court stated still more rationale for its earlier opinion:
 
 
 54
 The movants' claims that Dayton should have ordered the cabinet from another source, and, if it had, that it could have been installed in time for the open house, are speculative and ignore the court's findings. First, the movants do not cite any evidence to support their claim that the cabinet was widely available, and thus that Dayton could have easily obtained one from another source.
 
 
 55
 Kokomo Tube apparently took the above language to mean that the district court raised the issue of impossibility sua sponte and then engaged in some impermissible burden shifting. Kokomo Tube contends that impossibility of performance is an affirmative defense, which is, of course, the defendant's responsibility to raise. See Marcovich Land Corp. v. J.J. Newberry Co., 413 N.E.2d 935 (Ind.Ct.App.1980).
 
 
 56
 Kokomo Tube correctly assesses Indiana law on the subject of impossibility, but it wrongly asserts that the district court raised the issue in the first place. The district court initially noted the speculative nature of Kokomo Tube's bare assertions that Dayton should have ordered the cabinet from another source and had it installed in time for the open house. At most, the court may have hinted at the issue of impossibility when it then noted that Kokomo Tube offered no evidence that the cabinet was easily available from other sources. Immediately after this comment, the court repeated some of the rationale underlying its original opinion:
 
 
 57
 More importantly, even if such evidence [as to the cabinet's availability] had been presented, the ordering/installation of the cabinet were the subject of a separate contract--evidenced by a February 27 purchase order. That contract resulted from Kokomo Tube's own post-January decision to run the line with electricity instead of gravity. As previously stated, the court does not understand the movants to have argued at trial that Dayton breached that agreement, and nothing in their motion to alter or amend judgment suggests that they presented that claim to the court.[3]
 
 
 58
 Thus, the context surrounding the comment in question suggests that the district court did not in fact rely on the doctrine of impossibility as the underlying rationale for its opinion on Kokomo Tube and Triple S's Rule 59(e) motion. It is also clear that the district court did not base its original opinion on the doctrine of impossibility.
 
 
 59
 Kokomo Tube has isolated a passing sentence from the district court's opinion on Kokomo Tube and Triple S's Rule 59(e) motion and now argues that the district court erred as a matter of law. However, the crux of the district court's opinion was that the clear language of Dayton's letter did not fix a time for performance, and that, therefore, time was not of the essence. The court then noted, alternatively, that even if the letter had established that time was of the essence, Dayton did not breach the contract because its performance was not the sole, or even primary, reason the line was not completed by the time of the now infamous open house, for the reasons repeatedly stated above. Accordingly, the district court's conclusions were not contrary to Indiana law.
 
 
 60
 2. Economic Excuses?
 
 
 61
 Kokomo Tube next contends that the fact that it would have been more costly for Dayton to obtain the electrical cabinet from another source is an insufficient excuse, as a matter of law, for Dayton's failure to comply with the open house deadline. However, we fail to see where the district court excused Dayton's performance under the contract for this reason. It therefore makes little sense to delve into what Indiana considers to be a proper excuse for nonperformance.
 
 
 62
 D. The Content of the Agreement & the Extent of the Parties' Liability
 
 
 63
 The parties' final quarrel concerns whether Dayton charged Kokomo Tube a fair price for the static cast line project. The district court found that the parties' contract did not contain a fixed price and that the parties had not, and could not have, determined the scope of the work to be done by Dayton at the time they entered into the contract. The court therefore concluded that Kokomo Tube was obligated to pay Dayton the reasonable value of the labor and material provided. Kokomo Tube argues that the court's findings were clearly erroneous. Kokomo Tube believes that Rudd v. Anderson, 153 Ind.App. 11, 285 N.E.2d 836, 840 (1972), governs the amount that Dayton could have recovered. Rudd provides that parties should be bound by the price for which they contracted, unless there were so many alterations to the original contract that it would be infeasible to determine the amount owed for the construction by just looking at the contract price. Rudd, 285 N.E.2d at 840. Kokomo Tube argues that the parties agreed to a fixed price of $42,128.00, and since there were no substantial changes to the scope of the work entailed in performing the contract, it was not required to pay more than this agreed price. We disagree.
 
 
 64
 The contract itself supports the district court's conclusion. Dayton's offer letter first discusses a weekly cost to Kokomo Tube if Dayton provided four men and Kokomo Tube provided two men for the project. Dayton then estimated that if Kokomo Tube provided two additional men, the project would cost $42,128.00. Dayton then suggested that costs could be further reduced if Dayton did as much of the fabrication and repair work as possible in its own shop rather than at the job site. This practice would at least cut travel and living expenses. Dayton also suggested that to further reduce costs it would be helpful if the selected Kokomo Tube personnel were somewhat experienced in this line of work and were good at taking direction. Dayton offered an estimate for labor and then suggested how to keep costs from escalating. We do not see where it set a definite price term for its labor.
 
 
 65
 Dayton also noted that its proposal did not include costs for material. It mentioned that it would try to use whatever used material Kokomo Tube had on hand at its facility, provided it was in a condition such that it would not impugn the quality of the installation. Dayton also assured Kokomo Tube that it would use new material only where absolutely necessary. Any material which Dayton provided would be charged to Kokomo Tube at cost plus 15% F.O.B. Dayton. Dayton stated that it would allow Kokomo Tube to review the invoices for any material which Dayton had to purchase. Finally, Dayton proposed that Kokomo Tube would pay it with progressive payments on a weekly basis upon receipt of Dayton's invoices. These provisions indicate that there was no fixed price for materials either. Dayton stated that it would install used materials wherever possible to keep costs down, but quoted no money amount. Moreover, neither Dayton's charging cost plus 15% if it had to use new material nor its submitting invoices for weekly payments constitute a fixed price for materials. We reiterate that Kokomo Tube accepted this offer: "Time and materials as proposed. All material purchased to be approved in advance by Kokomo Tube Company."
 
 
 66
 The district court made a permissible inference from the evidence before it when it concluded that because the contract had no fixed price for labor and materials, it was a "time and materials" contract, rather than a "fixed price" contract. We therefore conclude that Kokomo Tube's reliance on Rudd v. Anderson is misplaced. Under Indiana law, "[w]here there is an agreement that compensation is to be paid but the price is not fixed, the party furnishing services and materials in performance of the contract is entitled to the reasonable value thereof." Indiana Bell Tel. Co. v. Ice Serv., Inc., 142 Ind.App. 23, 231 N.E.2d 820, 824 (1967). The district court used this test and considered that Dayton ultimately charged Kokomo Tube a substantially higher fee than Dayton's estimate. However, the court found that all the evidence suggested that the bill Dayton ultimately submitted was reasonable. We find nothing clearly erroneous in its findings, and we see no reason to disturb them on appeal.
 
 Conclusion
 
 67
 For the foregoing reasons, we AFFIRM the findings of the district court and REMAND the case for the district court to determine the appropriate amount of Dayton's attorneys' fees.
 
 
 
 [1]
 The owners of Triple S are the same members of the Spilman family that own Kokomo Tube
 
 
 [2]
 Bittner was the first case in this Circuit to address the issue now before us. Although Bittner has been criticized by other circuits, see, e.g., Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 226 (1st Cir.1996); Cooper v. Salomon Bros., Inc., 1 F.3d 82, 85 (2d Cir.1993), cert. denied, 510 U.S. 1063, 114 S.Ct. 737, 126 L.Ed.2d 700 (1994); Southern Travel Club v. Carnival Air Lines, Inc., 986 F.2d 125, 129-30 (5th Cir.1993); Jensen Electric Co. v. Moore, Caldwell, Rowland & Dodd, Inc., 873 F.2d 1327, 1329 (9th Cir.1989); Phelps v. Washburn University of Topeka, 807 F.2d 153, 154 (10th Cir.1986); Becton Dickinson & Co. v. District 65, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL-CIO, 799 F.2d 57, 61 (3d Cir.1986); Gates v. Central States Teamsters Pension Fund, 788 F.2d 1341, 1343 (8th Cir.1986), it is still recognized law in this Circuit
 
 
 [3]
 Kokomo Tube's curious response to the district court's observation that Kokomo Tube never alleged a breach of the second contract belies its position as to the first contract. On appeal, Kokomo Tube contends:
 The fact that Kokomo Tube did not allege a breach of the contract to obtain the electrical cabinet is irrelevant to the issue of whether Dayton breached the agreement to have the line completed by the open house. The contract for the cabinet did not specify a date for performance although it was implicit that the cabinet be in place in order to allow completion of the line by open house. Since there was no specific time for performance in that contract, there may, technically, not be a breach of that contract. (emphasis added).